Slip Op. 21–169

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| XIPING OPECK FOOD CO., LTD., ET AL., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| and | : | |
| | : | |
| YANCHENG HI-KING AGRICULTURE | : | Before: Richard K. Eaton, Judge |
| DEVELOPING CO., LTD., | : | |
| | : | Consol. Court No. 19-00202 |
| Consolidated Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## OPINION

[U.S. Department of Commerce's final results are sustained.]

Dated: December 17, 2021

*Yingchao Xiao*, Lee & Xiao, of San Marino, CA, argued for Plaintiffs Xiping Opeck Food Co., Ltd., *et al*.

*Adams C. Lee*, Harris Bricken McVay Sliwoski, LLP, of Seattle, WA, argued for Consolidated Plaintiff Yancheng Hi-King Agriculture Developing Co., Ltd.

*Mollie L. Finnan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Brendan Saslow*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Eaton, Judge: This case involves the final results of the United States Department of

Commerce's ("Commerce" or the "Department") administrative review of the antidumping duty

order on freshwater crawfish tail meat from the People's Republic of China ("China") covering

the period of September 1, 2017, through August 31, 2018. *See Freshwater Crawfish Tail Meat From the People's Republic of China*, 84 Fed. Reg. 58,371 (Dep't Commerce Oct. 31, 2019) ("Final Results") and accompanying Issues and Decision Mem. (Oct. 25, 2019) ("Final IDM"), PR 106.

Xiping Opeck Food Co., Ltd. ("Xiping Opeck"), Nanjing Gemsen International Co., Ltd. ("Nanjing Gemsen"), Xuzhou Jinjiang Foodstuffs Co., Ltd. ("Xuzhou Jinjiang") (collectively, "Plaintiffs"), and Yancheng Hi-King Agriculture Developing Co., Ltd. ("Consolidated Plaintiff" or "Hi-King") are Chinese producers and exporters of freshwater crawfish tail meat that participated in the underlying review and commenced this action contesting certain aspects of the Final Results. Now before the court are motions for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 filed by Plaintiffs and Hi-King. *See* USCIT R. 56.2; *see also* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 27-2 ("Pls.' Br."); Pls.' Reply, ECF No. 42; Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 26 ("Consol. Pl.'s Br."); Consol. Pl.'s Reply, ECF No. 41. For the reasons set forth below, Commerce's Final Results are sustained.

## BACKGROUND

On September 11, 2018, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on freshwater crawfish tail meat from China. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Req. Admin. Rev.*, 83 Fed. Reg. 45,888 (Dep't Commerce Sept. 11, 2018). Plaintiffs requested a review of their sales during the period of review. *See* Req. for Admin. Rev. (Sept. 18, 2018), PR 2.

The Crawfish Processors Alliance also requested a review of Plaintiffs, as well as Hi-King and others. *See* Crawfish Processors All.'s Req. Admin. Rev. (Oct. 1, 2018), PR 6.

On November 15, 2018, Commerce published a notice of initiation of the administrative

review. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 83 Fed. Reg. 57,411

(Dep't Commerce Nov. 15, 2018). Nanjing Gemsen together with Hubei Qianjiang Huashan

Aquatic Food and Product Co., Ltd. ("Hubei Qianjiang") (collectively, "Mandatory Respondents")

were selected for individual examination as mandatory respondents based on the volume of their

exports during the period of review, pursuant to 19 U.S.C. § 1677f-1(c)(2)(B) (2018). [1] *See*

Respondent Selection for the 2017-2018 Antidumping Duty Admin. Rev. (Feb. 13, 2019) at 2, 6,

PR 45.

Commerce preliminarily determined that dumping of the subject freshwater crawfish tail

meat occurred during the period of review and calculated an antidumping duty rate of 7.92 percent

for Nanjing Gemsen. *See Freshwater Crawfish Tail Meat From the People's Republic of China*,

84 Fed. Reg. 34,339, 34,340 (Dep't Commerce July 18, 2019) ("Preliminary Results") and

accompanying Decision Mem. (July 11, 2019) ("PDM"), PR 84. As for Hubei Qianjiang, which is

not a party to this action, Commerce calculated a rate of zero percent. *See* Preliminary Results, 84

Fed. Reg. at 34,340. The rates for the Mandatory Respondents were calculated by determining the

normal value of each company's respective exports using the nonmarket economy method under

---

[1]     As shall be seen, this Court has frequently wondered how the primary purpose of
determining accurate rates for unexamined respondents is advanced by selecting only two
mandatory respondents, particularly when the rate for one of the two is undetermined or
disregarded. *See, e.g.*, *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT ___,
___, 519 F. Supp. 3d 1224, 1236 (2021) (first citing *Zhejiang Native Produce & Animal By-
Products Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then
citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)).

Judges of the Federal Circuit have expressed similar concerns. *See, e.g.*, Oral Argument,
Y.C. Rubber Co. (North America) v. United States, No. 21-1489 (Fed. Cir. argued Nov. 5, 2021),
https://cafc.uscourts.gov/home/oral-argument/listen-to-oral-arguments/.

19 U.S.C. § 1677b(c)(1).[2] In doing so, Commerce selected Malaysia as the surrogate country for

valuing almost all of the Mandatory Respondents' factors of production.[3] For the main factor of

production, live freshwater crawfish, however, the Department relied on Spanish import data

classified under Integrated Tariff of the European Communities[4] ("TARIC") subheading

---

[2]     The statute provides:

If—

   (A) the subject merchandise is exported from a nonmarket economy
   country, and

   (B) the administering authority finds that available information does not
   permit the normal value of the subject merchandise to be determined under
   subsection (a),

the administering authority shall determine the normal value of the subject
merchandise on the basis of the value of the factors of production utilized in
producing the merchandise and to which shall be added an amount for general
expenses and profit plus the cost of containers, coverings, and other expenses. . . .
[T]he valuation of the factors of production shall be based on the best available
information regarding the values of such factors in a market economy country or
countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1).

[3]     The factors of production are those used to produce the subject merchandise—
which include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials
employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost,
including depreciation." 19 U.S.C. § 1677b(c)(3)(A)-(D).

[4]     The Integrated Tariff of the European Communities or "TARIC" is a customs
classification system akin to the Harmonized Tariff Schedule of the United States. The TARIC
system is organized in a hierarchical structure by sections, chapters, headings, and subheadings,
and is based upon the international Harmonized Commodity Description and Coding System
administered by the World Customs Organization. It applies to all member states of the European
Union ("EU") and is designed to provide for the classification of all products imported into the EU
in accordance with a system of numerical codes through which each product is assigned its own
TARIC number. A product's TARIC number determines, *inter alia*, the amount of customs duties
owed on the imported good. *See* Gerd M. Schwendinger & Katka Göcke, *Duty Assessment – Tariff
Classification (CN & TARIC)*, *in* 2 INTERNATIONAL CONTRACT MANUAL § 44:9 (West 2021).

0306.39.10, which covers live, fresh or chilled freshwater crawfish.[5] *See* Surrogate Value Mem. (July 11, 2019) at 2, PR 85. Commerce chose Spain because the record did not contain any data from Malaysia.[6] *See* Surrogate Country Mem. (July 11, 2019) at 5, PR 86. No party disputes the decision to use Spanish information.

Commerce also preliminarily determined that certain companies rebutted the presumption of *de jure* and *de facto* control[7] by the Chinese government and were therefore eligible for a separate, "all-others" rate. *See* PDM at 6; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (Fed. Cir. 2013) (citations omitted) ("The separate rate for eligible non-mandatory respondents is generally calculated following the statutory method for determining the 'all others rate' under § 1673d(c)(5)(A)."). Relying on the general rule under the statute, Commerce excluded Hubei Qianjiang's zero percent rate and used Nanjing Gemsen's 7.92 percent rate as the all-others rate for the six other companies that qualified for a separate rate,[8] but were

---

[5]       For consistency purposes, the court has adopted the parties' use of the term "crawfish." The TARIC, however, uses the term "crayfish." No one disputes this difference in naming conventions, nor is it relevant to the outcome of this case.

[6]       Mandatory Respondents placed on the record contemporaneous Spanish import data for valuing the live freshwater crawfish input. *See* Surrogate Country Mem. at 5.

[7]       Commerce presumes that exporters and producers from nonmarket economy countries, such as China, are under government control with respect to export activities and thus should receive a single country-wide dumping rate. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)). This presumption is rebuttable, however, if a company can demonstrate its independence from government control, both in law (*de jure*) and in fact (*de facto*). *See Sigma Corp.*, 117 F.3d at 1405. If a company successfully rebuts the presumption of government control, it may be eligible for a separate antidumping duty rate. If not, it will be considered part of the country-wide entity and will receive the country-wide rate. *See* 19 C.F.R. § 351.107(d) (2019); *see also Jilin*, 45 CIT at ___, 519 F. Supp. 3d at 1241.

[8]       A "separate rate" is a rate assigned to nonmarket economy exporters or producers that were not selected for individual examination but have rebutted the presumption of state

not individually examined (the "Separate Rate Companies").[9] *See* PDM at 7; *see also* 19 U.S.C.

§ 1673d(c)(5)(A).

In October 2019, Commerce published its Final Results which remained unchanged from

the Preliminary Results. *See* Final Results, 84 Fed. Reg. at 58,371. Commerce continued to use

Spanish import data under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater

crawfish) for valuing the live freshwater crawfish factor of production. *See id.* Commerce also

continued to use Nanjing Gemsen's calculated 7.92 percent rate as the all-others rate assigned to

the Separate Rate Companies. *See* Final IDM at 4-5.

On November 18, 2019, Commerce issued liquidation instructions for the subject entries

of freshwater crawfish tail meat. On November 29, 2019, Hi-King's period of review entries were

liquidated. Hi-King timely filed its original complaint in this action on December 3, 2019. In its

original complaint, Hi-King neither challenged Commerce's issuance of liquidation instructions

nor stated that its entries had been liquidated. In fact, Hi-King did not learn that its entries had

been liquidated until after its original complaint had been filed. *See* Consol. Pl.'s Br. 19.

Upon learning that its entries had been liquidated, Hi-King sought two orders from the

court: one permitting Hi-King to amend its original complaint to add a claim challenging the

Department's issuance of the liquidation instructions as premature and not in accordance with law;

and another directing Commerce to instruct United States Customs and Border Protection ("CBP"

or "Customs") to reset its entries to unliquidated status. *See* Hi-King's Mot. Leave Amend Compl.,

---

control, and are therefore not covered by the single country-wide rate. *See Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 784 (Fed. Cir. 2020).

[9]      The Separate Rate Companies are Deyan Aquatic Products and Food Co., Ltd., Hubei Nature Agriculture Industry Co., Ltd., Hubei Yuesheng Aquatic Products Co., Ltd., Xiping Opeck, Xuzhou Jinjiang, and Hi-King. *See* PDM at 8. Only Xiping Opeck, Xuzhou Jinjiang, and Hi-King are parties to this action.

ECF No. 22; *see also* Hi-King's Mot. for Order Directing Its Entries Be Reset to Unliquidated

Status, ECF No. 35. The court granted these motions, accepting Hi-King's amended complaint as

filed and resetting its entries to unliquidated status. *See* Order dated Apr. 23, 2020, ECF No. 28;

*see also* Order dated June 25, 2020, ECF No. 37.

Plaintiffs and Hi-King now challenge Commerce's Final Results. For their part, Plaintiffs

argue that (1) Commerce's determination that TARIC subheading 0306.39.10 (live, fresh or chilled

freshwater crawfish) is the best available information for calculating surrogate value is neither

supported by substantial evidence nor in accordance with law; and (2) Commerce unlawfully used

Nanjing Gemsen's rate as the all-others rate for the Separate Rate Companies. *See* Pls.' Br. 5, 10.

Hi-King, too, contests Commerce's calculation of surrogate value based on TARIC

subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) and raises an additional claim

challenging the Department's 15-day liquidation policy[10] as unlawful. *See* Consol. Pl.'s Br. 5, 27.

Together, Plaintiffs and Hi-King ask the court to remand the Final Results to Commerce

with instructions to (1) recalculate the surrogate value for the live freshwater crawfish factor of

production using Spanish import data under TARIC subheading 0306.19.10 (frozen freshwater

crawfish), instead of TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish);

(2) recalculate the all-others rate using an average of the Mandatory Respondents' calculated rates;

and (3) provide further guidance on the legality of Commerce's 15-day liquidation policy. *See* Pls.'

Br. 5-13; Consol. Pl.'s Br. 36-37.

---

[10]     Commerce previously had a practice of issuing liquidation instructions to CBP
fifteen days after publication of the final results of an administrative review in the Federal Register.
This policy has since been discontinued. *See Notice of Discontinuation of Policy To Issue
Liquidation Instructions After 15 Days in Applicable Antidumping and Countervailing Duty
Administrative Proceedings*, 86 Fed. Reg. 3,995 (Dep't Commerce Jan. 15, 2021).

Defendant the United States (the "Government"), on behalf of Commerce, asks the court to sustain the Final Results and maintains that (1) valuing the Mandatory Respondents' reported live freshwater crawfish factor of production using TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) is supported by substantial evidence and in accordance with law; (2) assigning Nanjing Gemsen's rate as the all-others rate was consistent with the requirements of the statute; and (3) because the court has granted Hi-King's consent motion directing Customs to reset its entries to unliquidated status, Hi-King's claim challenging Commerce's 15-day liquidation policy is moot. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 36 ("Def.'s Resp. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

### I.    Surrogate Value Selections

"The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Fine Furniture (Shanghai) Ltd. v. United States*, 42 CIT ___, ___, 353 F. Supp. 3d 1323, 1335 (2018) (quoting *Clearon Corp. v. United States*, 37 CIT 220, 222 (2013) (not reported in Federal Supplement)). If a domestic producer or other interested party

believes that a product is being sold at less-than-fair value in the United States, it may petition

Commerce to initiate an antidumping proceeding. *See* 19 U.S.C. § 1673a(b). During the initial

antidumping investigation, and any subsequent administrative review, Commerce will determine

whether dumping occurred by making "a fair comparison . . . between the export price[11] or

constructed export price[12] and normal value.[13]" 19 U.S.C. § 1677b(a). Where, as here, the

exporting country is a nonmarket economy, Commerce relies on surrogate values from market

economy countries to determine normal value. Thus, Commerce will calculate "the normal value

of the subject merchandise [based on] the value of the factors of production utilized in producing

---

[11]      "Export price" means

the price at which the subject merchandise is first sold (or agreed to be sold) before
the date of importation by the producer or exporter of the subject merchandise
outside of the United States to an unaffiliated purchaser in the United States or to
an unaffiliated purchaser for exportation to the United States, as adjusted under
subsection (c).

19 U.S.C. § 1677a(a).

[12]      "Constructed export price" means

the price at which the subject merchandise is first sold (or agreed to be sold) in the
United States before or after the date of importation by or for the account of the
producer or exporter of such merchandise or by a seller affiliated with the producer
or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted
under subsections (c) and (d).

19 U.S.C. § 1677a(b).

[13]      In general, "normal value" means "the price at which the foreign like product is
first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country,
in the usual commercial quantities and in the ordinary course of trade . . . ." 19 U.S.C.
§ 1677b(a)(1)(B)(i).

the merchandise and to which shall be added an amount for general expenses and profit plus the

cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B).[14]

In the Final Results, the Department's calculation of the dumping margins for Mandatory

Respondents was driven primarily by the surrogate value used for the live freshwater crawfish

factor of production. This is not surprising since both Mandatory Respondents Nanjing Gemsen

and Hubei Qianjiang reported using "live freshwater crawfish" as the main input in the production

of the subject merchandise. *See, e.g.*, Nanjing Gemsen's Sec. D Quest. Resp. at D-8 to D-9, PR

69.

To value the live freshwater crawfish factor of production, Commerce concluded that there

was no available data from Malaysia—the primary surrogate country—and instead turned to

Spanish import data.[15] *See* Final IDM at 3. Specifically, Commerce used data sourced from

---

[14]         Subsection 1677b(c)(1) provides for the calculation of normal value in nonmarket economy cases. It states that, in general, if

> (A) the subject merchandise is exported from a nonmarket economy country, and

> (B) [Commerce] finds that available information does not permit the normal value of the subject merchandise to be determined under subsection [1677b](a),

> [Commerce] shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.

19 U.S.C. § 1677b(c)(1)(A)-(B).

[15]         Generally, Commerce will value all factors of production with surrogate data from a single surrogate country. *See* 19 C.F.R. § 351.408(c)(2) (2019) ("Except for labor . . . the Secretary normally will value all factors in a single surrogate country."). Nevertheless, Commerce may look to values from more than one surrogate country when "a non-primary country provides values that are more accurate" than the primary surrogate country. *See Ancientree Cabinet Co. v. United States*, 45 CIT ___, ___, 532 F. Supp. 3d 1241, 1249 (citing *Lasko Metal Prods., Inc. v. United States*, 16 CIT 1079, 1082, 810 F. Supp. 314, 317 (1992), *aff'd*, 43 F.3d 1442 (Fed. Cir. 1994)).

*Agencia Tributaria*[16] under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish). *See* Surrogate Value Mem. at 2, 4.

All parties agree that live freshwater crawfish is the main factor of production, and no party challenges Commerce's use of Spanish import data for valuing the live freshwater crawfish factor of production. Rather, the sole disputed aspect of Commerce's live freshwater crawfish valuation is its decision to rely on Spanish import data under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish), instead of TARIC subheading 0306.19.10 (frozen freshwater crawfish).

   **A.    Commerce's Valuation of Mandatory Respondents' Live Freshwater Crawfish Factor of Production Under TARIC Subheading 0306.39.10 (Live, Fresh or Chilled Freshwater Crawfish) Is Supported by Substantial Evidence and in Accordance with Law**

According to Plaintiffs and Hi-King, Commerce should have selected TARIC subheading 0306.19.10 (frozen freshwater crawfish) instead of TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) to value the main factor of production, *i.e.*, live freshwater crawfish. Together, they argue that (1) the dataset selected by Commerce, TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish), is not the best available information because it also covers "other" products not comparable to live freshwater crawfish and is therefore less specific than their proposed alternative TARIC subheading 0306.19.10 (frozen freshwater crawfish); and (2) Commerce's determination that TARIC subheading 0306.39.10 covers live freshwater crawfish is not supported by substantial evidence because the record lacks any evidence to support this determination. *See* Pls.' Br. 10-13; *see also* Consol. Pl.'s Br. 29-36.[17]

---

[16]       Part of the Ministry of Finance, the Agencia Estatal de Administración Tributaria, commonly referred to as "Agencia Tributaria," is the revenue service of the Kingdom of Spain.

[17]       The relevant TARIC provisions in effect during the period of review are as follows:

_____

SECTION I    LIVE ANIMALS; ANIMAL PRODUCTS

CHAPTER 3    FISH AND CRUSTACEANS, MOLLUSCS AND OTHER
AQUATIC INVERTABRATES

. . .

| | | |
|---|---|---|
| 0306 | | Crustaceans, whether in shell or not, live, fresh, chilled, frozen, dried, salted or in brine; smoked crustaceans, whether in shell or not, whether or not cooked before or during the smoking process; crustaceans, in shell, cooked by steaming or by boiling in water, whether or not chilled, frozen, dried, salted or in brine; flours, meals and pellets of crustaceans, fit for human consumption: |

- *Frozen:*

| | | | |
|---|---|---|---|
| 0306 11 | - | - | Rock lobster and other sea crawfish . . . |
| 0306 12 | - | - | Lobsters . . . |
| 0306 14 | - | - | Crabs |
| 0306 15 | - | - | Norway lobsters . . . |
| 0306 16 | - | - | Cold-water shrimps and prawns . . . |
| 0306 17 | - | - | Other shrimps and prawns |
| 0306 19 | - | - | Other, including flours, meals and pellets of crustaceans, fit for human consumption: |

| | | | | |
|---|---|---|---|---|
| 0306 19 10 | - | - | - | Freshwater crayfish |
| 0306 19 90 | - | - | - | Other |

- *Live, fresh or chilled:*

| | | | |
|---|---|---|---|
| 0306 31 | - | - | Rock lobster and other sea crawfish . . . |
| 0306 32 | - | - | Lobsters . . . |
| 0306 33 | - | - | Crabs |
| 0306 34 | - | - | Norway lobsters . . . |
| 0306 35 | - | - | Cold-water shrimps and prawns . . . |
| 0306 36 | - | - | Other shrimps and prawns |
| 0306 39 | - | - | Other, including flours, meals and pellets of crustaceans, fit for human consumption: |

| | | | | |
|---|---|---|---|---|
| 0306 39 10 | - | - | - | Freshwater crayfish |
| 0306 39 90 | - | - | - | Other |

The Government argues that Commerce was reasonable in selecting TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) as the best available information because the record shows that Mandatory Respondents reported using live freshwater crawfish as the main input in their production processes, and TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) covers that main input. *See* Def.'s Resp. Br. 14. The Government also contends that, because Commerce was plainly quoting the official TARIC subheading descriptions in explaining its method of calculating surrogate value for the live freshwater crawfish factor of production, such descriptions are necessarily incorporated by reference in the Final Results and are suitable for that use and for the court to take judicial notice of the subheading's text. *See* Def.'s Resp. Br. 17.

Under the statute, Commerce is directed to value factors of production using the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority [*i.e.*, Commerce]."[18] *See* 19 U.S.C. § 1677b(c)(1). Because the term "best available information" is left undefined by the governing statute, courts have read this provision to give Commerce some latitude in choosing what constitutes the best available information. *See Wuhan Bee Healthy Co. v. United States*, 31

---

*See TARIC Consultation*, EUR. COMM'N: TAX'N & CUSTOMS UNION, https://ec.europa.eu/taxation_customs/dds2/taric/taric_consultation.jsp?Lang=en (change reference date to September 1, 2017; then retrieve measures for goods code "0306"; then click "Frozen" and "Live, Fresh or Chilled" under the "0306" heading; and then click "0306 19" and "0306 39") ("TARIC Database").

[18]     Commerce selects a primary surrogate country using a process that tracks the requirements of 19 U.S.C. § 1677b(c)(1) and (4). The Department's practice in identifying countries that are at the same level of economic development is described in the Department's Policy Bulletin No. 04.1. *See* Import Admin., U.S. Dep't Commerce, *Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 2, 2021).

CIT 1182, 1197 (2007) (not reported in Federal Supplement) (citing *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).

Despite the latitude afforded Commerce in selecting the best available information from among the available surrogate data for valuing the factors of production, it must still act in a manner consistent with the underlying objective of the antidumping statute—"to obtain the most accurate dumping margins possible." *See Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001) (citation omitted). "This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." *Id.* at 838, 159 F. Supp. 2d at 719 (citations omitted).

Here, the court finds reasonable Commerce's use of TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) for valuing Mandatory Respondents' reported live freshwater crawfish factor of production. Plaintiffs' and Hi-King's arguments to the contrary are unconvincing.

To begin, both Commerce's preferred TARIC subheading and that of Plaintiffs and Hi-King are *eo nomine* provisions. That is, the subheading itself "describes a commodity by a specific name, usually one well known to commerce." *See Myers v. United States*, 21 CIT 654, 659, 969 F. Supp. 66, 71 (1997) (cleaned up).

Since it is undisputed that live freshwater crawfish is the main input in the production of the subject merchandise, and Commerce's preferred TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) covers live freshwater crawfish by name, TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) is specific to the main input. Plaintiffs' and Hi-King's proposed alternative TARIC subheading 0306.19.10 (frozen freshwater crawfish), on

the other hand, describes frozen freshwater crawfish by name. Frozen freshwater crawfish is not

an input used in the production of the subject merchandise. Thus, Commerce's chosen TARIC

subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) is specific to Mandatory

Respondents' reported input and Plaintiffs' and Hi-King's proposed alternative TARIC

subheading 0306.19.10 (frozen freshwater crawfish) is not.

Plaintiffs and Hi-King make no real argument in favor of TARIC subheading 0306.19.10

(frozen freshwater crawfish). Rather, they dispute the appropriateness of Commerce's chosen

subheading. First, Plaintiffs insist that TARIC subheading 0306.39.10 (live, fresh or chilled

freshwater crawfish) is a basket category that covers "other" products than live crawfish such as

"flours, meals and pellets of crustaceans, fit for human consumption," and therefore is too broad

to be used to value the main input. *See* Pls.' Br. 13. Plaintiffs' argument betrays a basic

misunderstanding of the workings of the TARIC and indeed all tariff classification schemes based

on the World Customs Organization's Harmonized Commodity Description and Coding System.

Each of these schemes is hierarchical in nature. The six-digit 0306.39 heading,[19] under

which the eight-digit subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) is found,

is indeed a basket category covering many things other than live freshwater crawfish. This heading,

---

[19]     During the period of review, the six-digit 0306.39 heading, under which the eight-digit 0306.39.10 subheading falls, was described in the TARIC as follows:

|  |  | - | *Live, fresh or chilled:* |
| --- | --- | --- | --- |
| . . . |  |  |  |

| 0306 39 | - | - | Other, including flours, meals and pellets of crustaceans, fit for human consumption: |
| --- | --- | --- | --- |

| 0306 39 10 | - | - | - | Freshwater crayfish |
| --- | --- | --- | --- | --- |

*See* TARIC Database.

however, sets the outer limits of what can be classified by the subheadings that follow. For instance, the 0306.39 heading limits its subheadings to products "fit for human consumption." Therefore, live freshwater crawfish (or indeed anything else) "unfit for human consumption" could not be classified under any subheading below the 0306.39 heading.

The subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) employed by Commerce, despite falling under the six-digit 0306.39 basket heading, is not itself a basket provision. Rather, it is, as noted above, an *eo nomine* provision that is limited to the products described—live, fresh or chilled freshwater crawfish.

Thus, the entries into Spain that Commerce examined to determine the value of the Mandatory Respondents' main input did not contain "flours, meals and pellets of crustaceans, fit for human consumption." Rather, these entries into Spain were all entered under the eight-digit subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) and were thus all of live, fresh or chilled freshwater crawfish and nothing else.[20]

---

[20]    The European Union's tariff classification system contains general rules of interpretation nearly identical to the general rules of interpretation for the Harmonized Tariff Schedule of the United States. Rules 1 and 6 of the European Union's general rules of interpretation provide:

1.    The titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions. . . .

6.    For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of the rule, the relative section and chapter notes also apply, unless the context requires otherwise.

Next, Plaintiffs and Hi-King make a remarkable argument. They assert that Commerce's determination that TARIC subheading 0306.39.10 covers live freshwater crawfish is not supported by substantial evidence because the record lacks a "description of the particular products that are covered by [TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish)]." *See* Consol. Pl.'s Br. 31; *see also* Pls.' Br. 11. In other words, because in the Final Results Commerce provided only a narrative description[21] of the products TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) covers, the determination was unsupported by substantial evidence. Apparently, Plaintiffs and Hi-King believe that Commerce could only satisfy the substantial evidence requirement by reproducing a direct quote, printout, or photocopy of the product description from the TARIC database itself.

This claim is puzzling, however, since the subheading itself describes the input in question. That is, reference to the TARIC itself makes it clear that subheading 0306.39.10 covers live, fresh or chilled freshwater crawfish. Anyone reading the Final Results could easily find the subheading itself, read it in context, and confirm that its provisions covered the product that Commerce represented it covered. [22]

---

Council Regulation 2658/87 of July 23, 1987, On the Tariff and Statistical Nomenclature and on the Common Customs Tariff, annex, 1987 O.J. (L 361) 1, 15-16.

[21]     Commerce accurately identified on the record that TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) covers live freshwater crawfish, and Plaintiffs' and Hi-King's proposed alternative, TARIC subheading 0306.19.10 (frozen freshwater crawfish), covers frozen freshwater crawfish. *See, e.g.*, Surrogate Value Mem. at 4 ("[W]e preliminarily find it is appropriate to use contemporaneous Spanish import data on the record under TARIC number, 0306.39.10, which represents live crawfish."); *see also, e.g.*, Final IDM at 7 ("TARIC number 0306.39.10 covers live crawfish, and TARIC number 0306.19.10 covers frozen crawfish.").

[22]     Commerce made clear from the start its intention to value the live freshwater crawfish factor of production using contemporaneous Spanish import data under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish). *See* Surrogate Value Mem. at 4. In fact, the Mandatory Respondents themselves stated that "[i]f Commerce finds [TARIC

It is well established that courts may take judicial notice of the texts of statutes both domestic and foreign. *See, e.g.*, *Micron Tech., Inc. v. United States*, 31 CIT 2031, 2038 n.9, 535 F. Supp. 2d 1336, 1343 n.9 (2007) (taking judicial notice of Korean law). The court, having done so, finds that Commerce's claims of the contents of the products described by TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) are supported by substantial evidence.

**B.    Hi-King's Claim Challenging Commerce's Assertions Regarding Amendments to the TARIC Classification System Are Barred by the Doctrine of Exhaustion of Administrative Remedies and Would Be Unavailing Nonetheless**

In past reviews, Commerce reported using TARIC subheading 0306.<u>29</u>.10, [23] which covered "not frozen freshwater crawfish," to value Spanish imports of freshwater crawfish. *See* Surrogate Value Mem. at 4. Prior to Commerce's initiation of this administrative review, however,

---

subheading 0306.19.10 (frozen freshwater crawfish)] data unusable, Commerce shall use the inflated Spanish import data [under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish)]." *See* Mandatory Respondents' Comments on Surrogate Value (Apr. 26, 2019) at 2, PR 75.

Thus, Plaintiffs and Hi-King were aware of Commerce's understanding of the TARIC code at the preliminary stages of the underlying review. *See, e.g.*, Hi-King Case Br. (Aug. 26, 2019) at 1, PR 101 (quoting Surrogate Value Mem. at 4) ("The Department also specifically stated that it found it appropriate to use the contemporaneous Spanish import data on the record under TARIC number 0306.39.10 [(live, fresh or chilled freshwater crawfish)], because this tariff heading 'represents live crawfish.'"). Despite such notice, they have not provided any authority to support their arguments to the contrary, notwithstanding their burden to do so. *See, e.g.*, *United Steel & Fasteners, Inc. v. United States*, 44 CIT ___, ___, 469 F. Supp. 3d 1390, 1400 (2020) (alteration in original) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.").

[23]    In an attempt to prevent any confusion between the discontinued TARIC subheading 0306.<u>29</u>.10 (not frozen freshwater crawfish), which Commerce had relied upon in past reviews to value Spanish imports of live freshwater crawfish, and the current TARIC subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish) used by Commerce to value Spanish imports of live freshwater crawfish in this review, the court has underlined the fifth and sixth digits (*i.e.*, .<u>29</u> & .<u>39</u>) of each subheading.

it found that TARIC subheading 0306.<u>29</u>.10 (not frozen freshwater crawfish) had been discontinued, and the products previously covered by TARIC subheading 0306.<u>29</u>.10 (*i.e.*, not frozen freshwater crawfish) were reclassified under either TARIC subheading 0306.<u>39</u>.10, which covers live, fresh or chilled freshwater crawfish, or 0306.99.10, covering "other" types of freshwater crawfish, *i.e.*, those that are not frozen, live, fresh or chilled (*e.g.*, cooked freshwater crawfish). *See* Surrogate Value Mem. at 4.

   In both the Surrogate Value Memorandum and the Final IDM, Commerce stated that using the current TARIC subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish) for valuing Mandatory Respondents' live freshwater crawfish factor of production was appropriate because it was now the most specific to the main input. In other words, Commerce identified changes in the TARIC classification system to explain why it relied on TARIC subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish) in the current administrative review, whereas, in past reviews, it had relied on TARIC subheading 0306.<u>29</u>.10 (not frozen freshwater crawfish).

   Hi-King argues that it was "inappropriate [for Commerce] to assume anything about the asserted changes [to the TARIC] given the utter lack of supporting record evidence," and, as a result, Commerce unlawfully selected TARIC 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish) based on unsubstantiated assertions. *See* Consol. Pl.'s Br. 29-30 ("There is no evidence to establish what is the specific connection between the prior TARIC [subheading] 0306.<u>29</u>.10 [(not frozen freshwater crawfish)] and the . . . new TARIC [subheadings] that supposedly correspond to the old TARIC [subheading]."). Hi-King makes this argument without giving any reason as to why Commerce should trace the new subheadings to the old ones.

According to the Government, Hi-King failed to make this argument at the agency level and, therefore, the doctrine of exhaustion prevents Hi-King from raising this argument for the first time before the court.

"The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court." *Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1305, 435 F. Supp. 2d 1261, 1292 (2006) (quoting *Ingman v. U.S. Sec'y of Agric.*, 29 CIT 1123, 1126 (2005) (not reported in Federal Supplement)). "This court has discretion to determine when it will require the exhaustion of administrative remedies" and "shall, where appropriate, require the exhaustion of [such] remedies." 28 U.S.C. § 2637(d); *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT 1619, 1627, 949 F. Supp. 2d 1311, 1321 (2013) (citation omitted). "Requiring exhaustion is appropriate where doing so 'can protect administrative agency authority and promote judicial efficiency.'" *See Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1265 (2014) (quoting *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013)). "Exhaustion can 'serve judicial efficiency . . . by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution.'" *Id.* (alteration in original) (quoting *Itochu*, 733 F.3d at 1145).

The record shows that Hi-King merely mentioned, in passing, that Commerce had noted TARIC subheading 0306.<u>29</u>.10 (not frozen freshwater crawfish) was discontinued, and that the main input for products covered by this review were reclassified under, *inter alia*, TARIC subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish). *See* Hi-King Case Br. at 2. That is, at the agency level, Hi-King did not challenge the evidentiary support for Commerce's assertions regarding whether products previously classified under TARIC subheading 0306.<u>29</u>.10

(not frozen freshwater crawfish) should be classified under the amended TARIC provisions. Hi-King instead claimed that Commerce's selection of TARIC subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish) was unlawful because it was not the best available information on the record.

"Respondents do not meet exhaustion requirements 'by merely mentioning a broad issue without raising a particular argument.'" *See Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 44 CIT ___, ___, 471 F. Supp. 3d 1313, 1338 (2020) (quoting *Timken Co. v. United States*, 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340-41 (2002)). Thus, Hi-King's passing mention of Commerce's observations concerning amendments to the TARIC classification system, without more, is insufficient to support a claim before the court that Commerce failed to substantiate its assertion that subheading 0306.<u>29</u>.10 (not frozen freshwater crawfish) was discontinued and replaced with, *inter alia*, subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish), or that tracing these changes was somehow necessary for Commerce's reliance on the plain language of subheading 0306.<u>39</u>.10 (live, fresh or chilled freshwater crawfish)—*i.e.*, the TARIC subheading in effect during the underlying review.

It is clear from the record that Hi-King failed to exhaust its administrative remedy by failing to make its arguments before the Department when it had the opportunity to do so—despite having notice of Commerce's conclusions concerning the relevant changes to the TARIC classification system, and the agency's intention to rely on the revised TARIC schedule. Thus, Hi-King failed to take advantage of its opportunity to make its case before Commerce and deprived Commerce of its chance to consider Hi-King's claim and make a decision. Accordingly, the doctrine of exhaustion precludes Hi-King from raising this claim for the first time before this court.

Even if Hi-King had not failed to exhaust its administrative remedy, its claim would fail. Notably, Hi-King does not dispute that changes were made to the TARIC classification system. Rather, Hi-King's claim is that the record lacks any evidence to support Commerce's statements that the products previously classified under the now discontinued TARIC subheading 0306.29.10 (not frozen freshwater crawfish) were recast under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) or subheading 0306.99.10 (other types of freshwater crawfish that are not frozen, live, fresh or chilled). *See* Consol. Pl.'s Br. 30. Hi-King makes this claim without revealing why tracing the products previously classified under the old subheading to the revised subheading was important in the Final Results or is necessary to a just outcome in this case.

There is no dispute that Commerce used Spanish import data for merchandise entered under subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) to value the Mandatory Respondents' main input without reference to any subheading from a previous iteration of the TARIC. TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) was in effect during the period of review. In other words, Commerce's observation that the law has changed from past reviews, while helpful to those following the freshwater crawfish line of cases, was not dispositive of any issue in this case because Commerce used the current TARIC provisions in reaching its findings.

As the foregoing portions of this opinion hold, Commerce has supported with substantial evidence its finding that live freshwater crawfish was included under TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish).

Although Commerce is required to support its selection of TARIC subheading 0306.39.10 (live, fresh or chilled freshwater crawfish) with substantial evidence—which the court finds that it has done—it does not have to do the same with respect to its statements noting previous changes

to the law. Thus, the court finds that Hi-King's argument would be unavailing even if not barred by the doctrine of exhaustion of administrative remedies.

## II.   Commerce's Calculation of the Separate Rate Companies' "All-Others" Rate Is in Accordance with Law

In the underlying administrative review, Commerce limited the number of individually examined exporters to two mandatory respondents and calculated entity-specific rates for Hubei Qianjiang and Nanjing Gemsen. *See* 19 U.S.C. § 1677f-1(c)(2)(B).[24] Commerce also determined that certain respondents, not selected for individual examination, had rebutted the presumption of *de jure* and *de facto* control by the Chinese government and were therefore eligible for a separate rate.

To calculate the separate rate for non-individually examined respondents, Commerce has adopted the statutory method for calculating the "all-others" rate under 19 U.S.C. § 1673d(c)(5). While § 1673d(c)(5), by its terms, applies to investigations, this method has been approved by courts for use in administrative reviews. *See, e.g.*, *Navneet Publ'ns (India) Ltd. v. United States*, 38 CIT ___, ___, 999 F. Supp. 2d 1354, 1359 (2014) ("Though § 1673d(c)(5) explicitly references investigations, nothing in that statute or in any other statute expressly or impliedly precludes application to administrative reviews.").

---

[24]     When it is not practicable for Commerce to calculate individual weighted average dumping margins for each exporter and producer involved in the underlying review, the statute authorizes Commerce to limit the number of individually examined exporters in a manner that contemplates a "reasonable number of exporters and producers" that either (A) constitute a statistically representative sample of all known exporters and producers of the subject merchandise; or (B) includes "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." *See* 19 U.S.C. § 1677f-1(c)(2)(A), (B).

Subsection 1673d(c)(5) governs Commerce's calculation of the all-others rate. Paragraph (A) provides:

**(A)    General rule**

For purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title [*i.e.*, based on facts available or AFA].

19 U.S.C § 1673d(c)(5)(A).

In other words, the statute provides that to calculate the all-others rate, Commerce will use the weighted average of all mandatory respondents' rates, excluding any rates that are zero, *de minimis*, or based entirely on facts available or adverse facts available.

Here, Commerce applied the all-others method to its separate rate calculations. Pursuant to the statute, Commerce excluded Hubei Qianjiang's zero percent rate from its separate rate calculations, and assigned the Separate Rate Companies a rate of 7.92 percent—a rate equal to the calculated rate for Nanjing Gemsen, the sole remaining mandatory respondent with a rate that was not zero, *de minimis*, or based entirely on facts available or adverse facts available. *See Final Results*, 84 Fed. Reg. at 58,372 ("[I]n accordance with [19 U.S.C. § 1673d(c)(5)(A)] and its prior practice, Commerce has assigned Nanjing Gemsen's calculated rate (*i.e.*, 7.92 percent) as the separate rate for the non-examined separate rate exporters for these final results.").

First, Plaintiffs take the position that, by refusing to include Hubei Qianjiang's zero percent rate in its all-others rate calculation, Commerce failed in its obligation to determine an accurate rate for the Separate Rate Companies. Next, they argue that Commerce's decision to apply the general rule under § 1673d(c)(5)(A), and to exclude Hubei Qianjiang's zero percent rate from its separate rate calculations, was unlawful because the statute requires an *average* of the Mandatory

Respondents' rates. Finally, Plaintiffs contend that established Commerce policy requires it to include zero percent rates in its separate rate calculations when only two mandatory respondents were selected for individual examination. *See* Pls.' Br. 5-9.

To make their case, Plaintiffs assert that "Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information," and the "fundamental requirement of accuracy requires, in this case, the averaging of the margins of both mandatory respondents." Pls.' Br. 8. Thus, according to Plaintiffs, only by averaging the margins applied to both Mandatory Respondents could Commerce calculate the dumping margins as Congress intended—that is, "as accurately as possible." *See* Pls.' Br. 8. Therefore, Plaintiffs ask the court to remand with instructions that Commerce calculate the all-others rate as a simple average of the rates received by Hubei Qianjiang (0.00 percent) and Nanjing Gemsen (7.92 percent). *See* Pls.' Br. 7-8.

This Court has expressed a certain sympathy with Plaintiffs' first argument. *See, e.g.*, *Jilin*, 45 CIT at ___, 519 F. Supp. 3d at 1236 (citations omitted) (footnote omitted) ("Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the all-others rate in a review, a devolution that this Court has regarded with some skepticism.").[25] There can be little question that, if Commerce were to change its method and name

---

[25]     What this Court in *Jilin* called the statute's "Mandatory Respondent Exception" has had a tortured path:

The Mandatory Respondent Exception is used when the number of respondents in a proceeding is so "large" that it is "not practicable to make individual weighted average dumping margin determinations." 19 U.S.C. § 1677f-1(c)(2). When that occurs, Commerce may determine the weighted-average dumping margins for a "reasonable" number of exporters or producers by limiting its examination to (1) "a sample of exporters, producers, or types of products that is statistically valid based

on the information available to the administering authority at the time of selection," or (2) "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." *Id.* § 1677f-1(c)(2)(A), (B). The weighted average of the rates for each mandatory respondent forms the basis of the all-others rate for respondents not individually examined. *See id.* § 1673d(c)(1)(B)(i). Here, noting the "large" number of respondents in the underlying proceeding, Commerce chose to employ this Mandatory Respondent Exception and base the determination of the all-others rate on the rate determined for two mandatory respondents, which were the two largest exporters of subject merchandise by volume during the period of review. Jilin was one of these. The other was Jiangsu.

The aim of the Mandatory Respondent Exception is to determine an *accurate* all-others rate, based on a weighted average of rates determined for mandatory respondents by statistical sampling or the use of a statistically sufficient volume of exports. The statute directs Commerce to (1) "determine the estimated weighted average dumping margin for each exporter and producer individually investigated" and (2) "determine" in accordance with the statute's method "the estimated all-others rate for all exporters and producers not individually investigated." 19 U.S.C. § 1673d(c)(1)(B)(i), (c)(5)(B). Use of the Mandatory Respondent Exception is intended to fulfill the prime purpose of the antidumping duty statute to calculate accurate rates. *Compare* 19 U.S.C. § 1677f-1(c)(2), *with* 19 U.S.C. § 1673d(c)(1)(B)(i). The role of the mandatory respondents is therefore broader than that of the usual individually-examined respondent, because the mandatory respondents serve as surrogates for what can be (and is, in this case) a much larger group.

Commerce now employs the Mandatory Respondent Exception often, and reviews only a limited number of selected respondents. *See, e.g.*, *Certain Fresh Cut Flowers From Colombia: Preliminary Results & Partial Rescission of Antidumping Duty Admin. Rev.*, 62 Fed. Reg. 16,772 (Dep't Commerce Apr. 8, 1997). Indeed, Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be "representative" of unexamined respondents for the purpose of calculating the all-others rate in a review, a devolution that this Court has regarded with some skepticism. *See, e.g.*, *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009).

Even when Commerce does choose two mandatory respondents (and despite having replaced or substituted mandatory respondents in the past), it has more recently declined to name a mandatory respondent replacement when it became clear that a chosen mandatory entity would not participate or is otherwise excluded from examination. *See, e.g.*, *Bestpak*, 716 F.3d at 1374. When one of two chosen mandatory respondents does not participate or is excluded from participation, a

failure to name a replacement can result (as it did here) in an all-others rate being determined based on the margin of a sole respondent whose percentage of export volume is quite small in relation to the total volume of exports. *See, e.g.*, *Stainless Steel Sheet & Strip From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value & Preliminary Affirmative Determination of Critical Circumstances*, 81 Fed. Reg. 64,135 (Dep't Commerce Sept. 19, 2016), and accompanying decision memorandum.

In November 2013, Commerce announced changes in its method of selecting mandatory respondents. *See Antidumping Procs.: Announcement of Change in Dep't Practice for Respondent Selection in Antidumping Duty Procs. & Conditional Review of the Nonmarket Econ. Entity in NME Antidumping Duty Procs.*, 78 Fed. Reg. 65,963 (Dep't Commerce Nov. 4, 2013) ("*Practice Change*").

As originally enacted, a 1984 change in the statute permitted Commerce to use "statistical sampling" of products "whenever a significant volume of sales is involved or a significant number of adjustments to prices is required." *See* Pub. L. No. 98-573, § 620(a), 98 Stat. 2948, 3039 (1984). With passage of the Uruguay Round Agreements Act in 1994, Commerce's mandatory respondent selection practice came to rely generally upon the then-new provision of 19 U.S.C. § 1677f-1(c)(2) for "exporters and producers accounting for the *largest volume* of the subject merchandise from the exporting country *that can be reasonably examined*" ("subsection (B)"), and it resorted to using the "statistically valid" sampling provision ("subsection (A)") only rarely. *See Proposed Methodology for Respondent Selection in Antidumping Procs.; Req. for Cmt.*, 75 Fed. Reg. 78,678, 78,678 (Dep't Commerce Dec. 16, 2010) ("*Proposed Methodology*") (emphasis added) (the Department has used subsection (B) in "*virtually every one of its proceedings*"). The 2013 *Practice Change* announced that Commerce would

> consider sampling when it can select a *minimum of three respondents* to examine individually and when the three largest respondents (or more if the Department intends to select more than three respondents) by import volume of the subject merchandise under review account for normally no more than 50 percent of total volume. *The Department considers 50 percent [of import volume] to be a reasonable threshold* because in these circumstances the agency would be able to calculate specific dumping margins *for the majority* of imports during a period of review.

*Practice Change*, 78 Fed. Reg. at 65,968 (emphasis added).

Thus, the *Practice Change* announced that Commerce would use the statistical sampling found in subsection (A) only if certain conditions were met. Otherwise, subsection (B) (volume) would be used. Specifically, Commerce would use the sampling of subsection (A) "where possible" on a case-by-case basis for the selection of mandatory respondents, if interested parties made a specific request to

more than two mandatory respondents, separate rate companies would receive more accurate rates, and a great deal of litigation would be avoided. Judges of the Federal Circuit have expressed similar views. *See, e.g.*, Oral Argument, Y.C. Rubber Co. (North America) v. United States, No. 21-1489 (Fed. Cir. argued Nov. 5, 2021), https://cafc.uscourts.gov/home/oral-argument/listen-to-oral-arguments/.

Although Plaintiffs' proposed method of averaging in the zero percent rate might well result in a more accurate all-others rate, it is not required by the law. Commerce's exclusion of Hubei Qianjiang's zero percent rate from its separate rate calculation comports with the language of the statute. *See* 19 U.S.C. § 1673d(c)(5)(A) (emphasis added) ("[T]he estimated all-others rate *shall* be an amount equal to the weighted average of the estimated weighted average dumping

---

use that method. *See Proposed Methodology*, 75 Fed. Reg. at 78,678. Commerce, however, would forgo the subsection (A) option (and rely on the (B) option): (1) if it is unable to examine at least three companies "due to resource constraints"; or (2) *when the largest companies by import volume account for at least 50 percent of total imports*; or (3) when the "characteristics" of the underlying population make it highly likely that results obtained from the largest possible sample would be unreasonable to represent the population (*i.e.*, when "information obtained by or provided to the Department provides a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from such information that would be associated with the remaining exporters"). *Practice Change*, 78 Fed. Reg. at 65,964-65.

There can be little doubt that relying almost exclusively on subsection (B) made Commerce's work easier, while still, at least arguably, using a sufficiently large sample of imports to calculate an accurate rate for the unexamined respondents receiving the all-others rate. *Cf. Practice Change*, 78 Fed. Reg. at 65,968. The Department, however, does not appear to always follow the guidance of the *Practice Change*. *See, e.g.*, *id.* ("The Department considers 50 percent [of import volume] to be a reasonable threshold because in these circumstances the agency would be able to calculate specific dumping margins for the majority of imports during a period of review.").

*Jilin*, 45 CIT at ___, 519 F. Supp. 3d at 1235-38 (cleaned up).

margins established for exporters and producers individually [examined], *excluding* any *zero* and *de minimis* margins, and any margins determined entirely under section 1677e of this title.").

By claiming that Commerce must average Hubei Qianjiang's zero percent rate with Nanjing Gemsen's rate of 7.92 percent, Plaintiffs ignore the statute's express direction that Commerce exclude "any zero and de minimis margins, and any margins determined entirely [based on facts available or adverse facts available]." *See id.* Nonetheless, Plaintiffs maintain that Commerce has recently established a policy of *including zero or de minimis* rates in the calculation of the all-others rate when there are only two mandatory respondents. *See* Pls.' Br. 9 & n.4. Plaintiffs misread the authorities.

Pursuant to the statute, if the estimated weighted average dumping margins established for *all* mandatory respondents are zero, *de minimis*, or determined entirely based on facts available or adverse facts available, then Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." *See* 19 U.S.C. § 1673d(c)(5)(B). In other words, the statute provides that Commerce is permitted to average zero or *de minimis* rates under the "any reasonable method" exception *when all of the individually examined respondents' rates are zero or de minimis. See id.*

For example, in *Bestpak*, a case with only two mandatory respondents, one respondent was individually examined and received a *de minimis* rate, while the other was assigned an adverse facts available rate because it failed to cooperate. *See Bestpak*, 716 F.3d at 1375 ("In this case . . . the only two dumping margins on the administrative record were Yama's *de minimis* rate and Jintian's AFA China-wide rate [which it was assigned because of its refusal to cooperate in the investigation]."). Thus, both respondents received rates that were zero, *de minimis*, or determined

entirely based on facts available or adverse facts available. *See id.* Therefore, the conditions for applying the exception found in § 1673d(c)(5)(B) were met, and Commerce took a simple average of the two rates. *See id.*

Unlike in *Bestpak*, use of the exception in § 1673d(c)(5)(B) (and thus averaging the Mandatory Respondents' rates) is not statutorily directed here, because the conditions for its application—*i.e.*, when the dumping margins for *all* individually investigated mandatory respondents are zero, *de minimis*, or determined entirely based on facts available or adverse facts available—were not satisfied. That is, mandatory respondent Nanjing Gemsen's calculated rate of 7.92 percent was not zero, *de minimis*, or determined entirely based on facts available or adverse facts available.

Plaintiffs have cited no case approving the exception found in § 1673d(c)(5)(B) when Commerce has available to it a calculated margin that is greater than zero and not *de minimis*. One day a court may find that record evidence supports a finding that, in a case similar to that presented here, the assigned rate is so far from the mark that it is unlawful. That day has not yet arrived. Accordingly, the court finds that Commerce's reliance on the general rule found in 19 U.S.C. § 1673d(c)(5)(A) in applying Nanjing Gemsen's rate to the Separate Rate Companies as the all-others rate is reasonable and in accordance with law.

### III.    Hi-King's Claim Challenging the Lawfulness of Commerce's 15-Day Liquidation Policy Is Moot

Commerce published its Final Results on October 31, 2019 and stated therein that it "intend[ed] to issue assessment instructions to CBP 15 days after the date of publication of the[] final results of review." Final Results, 84 Fed. Reg. at 58,372. The liquidation instructions were

issued on November 18, 2019, and eleven days later, on November 29, 2019, Hi-King's entries were liquidated.

On November 26, 2019, three days before its entries were liquidated, Hi-King timely filed a summons with this Court initiating its appeal challenging certain aspects of the Department's Final Results. On December 3, 2019, Hi-King timely filed its initial complaint. On December 4, 2019, it submitted its Form 24 request for a statutory injunction preventing the liquidation of its entries. The following day, on December 5, 2019, the court granted Hi-King's request enjoining Customs' liquidation of its entries.

It was not until after the filing of its initial complaint, however, that Hi-King's counsel realized its entries had been liquidated prior to the issuance of the statutory injunction. Hi-King filed two motions in response to learning that its entries had been liquidated. The first, on March 19, 2020, was for leave to file an amended complaint to add a claim challenging the lawfulness of Commerce's 15-day liquidation policy. The second, on May 21, 2020, was for an order directing Customs to reset its entries to unliquidated status. By orders dated April 23, 2020 and June 25, 2020, respectively, Hi-King's amended complaint was deemed filed and its entries reset to unliquidated status. *See supra* Background.

Hi-King claims that, notwithstanding the June 25, 2020 order directing Customs to reset its entries to unliquidated status—with which Customs has complied—its case has not been mooted, and the court retains jurisdiction over its claim alleging that Commerce's 15-day liquidation policy is unlawful. Hi-King acknowledges that the particular harm it suffered was remedied by the court's June 25, 2020 order. It maintains, however, that Commerce's alleged unlawful application of the 15-day liquidation policy is not limited to this review. *See* Consol. Pl.'s Reply 15. For that reason, Hi-King argues that the issue is "capable of repetition yet evading

review," and therefore falls within the narrow exception to the mootness doctrine. *See* Consol.

Pl.'s Reply 15. Thus, Hi-King asks the court to "provide further guidance [regarding] the legality

of the Department's 15-day liquidation policy." Consol. Pl.'s Reply 18.

For its part, the Government argues that Hi-King's claim is moot because the court's order

restored its entries to unliquidated status, and the "capable of repetition, yet evading review"

exception to the mootness doctrine does not apply here.

Following the court's order, and following the entry of similar orders in other cases before

this Court,[26] Commerce issued a notice effectively discontinuing the use of its 15-day liquidation

policy. Counsel for Commerce did not inform the court of the notice. Commerce published the

notice in the Federal Register on January 15, 2021, announcing that:

> effective immediately upon publication of this notice, [Commerce] is discontinuing
> its policy to issue liquidation instructions in certain segments of antidumping duty
> (AD) and countervailing duty (CVD) administrative proceedings to [Customs] 15
> days after publication or mailing, whichever applies, of final administrative
> determinations where no statutory injunction was requested . . . .

*Notice of Discontinuation of Policy To Issue Liquidation Instructions After 15 Days in Applicable*

*Antidumping and Countervailing Duty Administrative Proceedings*, 86 Fed. Reg. 3995, 3995

(Dep't Commerce Jan. 15, 2021).

Accordingly, because Commerce's 15-day liquidation policy has been discontinued, the

"capable of repetition, yet evading review" exception to the mootness doctrine does not apply.

That is, Hi-King's claim that Commerce will continue to unlawfully employ its 15-day liquidation

---

[26]     *See, e.g.*, Order, Jinxiang Infang Fruit & Vegetable Co., v. United States, 44 CIT ___, ___, 476 F. Supp. 3d 1415 (2020) (Gordon, J.) (No. 19-211), ECF No. 24; *NTSF Seafoods Joint Stock Co. v. United States*, 44 CIT ___, ___, 487 F. Supp. 3d 1310, 1315 (2020) (Choe-Groves, J.) ("The court issued a letter on August 26, 2020 requesting that Defendant consider restoring NTSF's subject entries to unliquidated status. Defendant consented. The court ordered that NTSF's subject entries be restored to unliquidated status.").

policy in future administrative reviews has been rendered moot by the Department's discontinuation of the policy. For that reason, the court does not address this issue.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's Final Results. Judgment shall be entered accordingly.

       /s/ Richard K. Eaton       
Judge

Dated: December 17, 2021
            New York, New York